UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------x

SIMON LIANI,

                                  Appellant,

          -against-                                    MEMORANDUM AND ORDER
                                                       09-CV-2651 (ILG), 09-CV-2652 (ILG)
ASTON BAKER, et al.,

                                  Appellees.

-------------------------------------------------x

SHELDON GOOD & COMPANY
AUCTIONS NORTH EAST, LLC,

                                  Appellant,

          -against-

SIMON LIANI, et al.,

                                  Appellees.

-------------------------------------------------x

GLASSER, United States Senior District Judge:

          The appellants Simon Liani ("Liani") and Sheldon Good & Company Auctions North

East, LLC ("Sheldon Good") each appeal different portions of a bankruptcy court decision

denying their cross-motions for summary judgment.  The proceeding below was an adversary

action arising out of the bankruptcy of Aston Baker ("Baker").  For the reasons stated below, the

decision of the Bankruptcy Court is affirmed in part, reversed in part, and remanded for further

proceedings.

**FACTS**

The Court assumes familiarity with the adversary action and the bankruptcy proceedings out of which it arose, and only the facts that are directly relevant to the substance of these appeals will be recounted. On November 15, 2001, Baker filed a petition for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of New York ("Bankruptcy Court"). On January 25, 2002, the case was converted to a case under Chapter 11. On June 20, 2005, the Bankruptcy Court issued an order (the "Retention Order") authorizing the retention of Sheldon Good to auction off four of Baker's real properties, including one located at 490 New York Avenue, Brooklyn, NY (the "New York Avenue property"). In its role as auctioneer, Sheldon Good prepared a Bidder's Packet containing information about the New York Avenue property and held open houses on nine separate dates at which prospective buyers and their experts could inspect the property. Liani ordered the Bidder's Packet on July 20, 2005, and received it approximately two weeks later. He did not attend any of the open houses.

On September 27, 2005, Sheldon Good held a public auction of the four properties, which Liani attended. Prior to the auction, Liani signed a Bidder's Affidavit acknowledging, among other things, that the properties would be sold "where is" and "as is." Liani subsequently placed the winning $5 million bid for the New York Avenue property. Liani executed a Purchase and Sale Agreement ("PSA") and deposited a down payment of $325,000.00 with Sheldon Good, as escrow agent.

The PSA called for Liani to make an additional deposit payment of $212,500.00 by the second business day following the auction, but Liani failed to do so. On October 27, 2005, the Bankruptcy Court found Liani to be in default, and Baker informed Liani as well by a letter dated the following day. In a letter dated October 31, 2005, Liani demanded the return of his down

payment, alleging misrepresentations in connection with the sale.  On November 29, 2005 the Bankruptcy Court approved the sale of the New York Avenue property by Sheldon Good to another purchaser.

## PROCEDURAL HISTORY

On December 22, 2005, Liani brought an adversary action against Baker and Sheldon Good seeking the return of his $325,000 down payment.  On March 15, 2006, Sheldon Good filed a counterclaim against Liani and a cross-claim against Baker arguing that Sheldon Good is entitled to retain 50% of the down payment and that Baker must indemnify Sheldon Good for legal costs.  On October 12, 2007, Liani filed a motion for summary judgment against Baker and Sheldon Good.  On October 19, 2007, Baker filed a cross-motion for summary judgment against Liani, and Sheldon Good filed a motion for summary judgment on its cross-claim against Baker. The bankruptcy court denied the motions of Liani and Sheldon Good, but granted Baker's cross-motion for summary judgment, thus awarding him the entirety of the $325,000 down payment. Liani and Sheldon Good separately appeal the denials of their motions.  These appeals have been consolidated for decision here.

## DISCUSSION

### 1.  Standard of Review

#### a.  Appeal from Bankruptcy Court

When reviewing a decision of the Bankruptcy Court, the District Court will "review conclusions of law *de novo*, and findings of fact under a clearly erroneous standard."  In re Ionosphere Clubs, Inc., 922 F.2d 984, 988 (2d Cir. 1990).  The Court "review[s] a grant of

summary judgment *de novo*, taking all factual inferences in favor of the non-moving party." <u>In re Blackwood Assocs., L.P.</u>, 153 F.3d 61, 67 (2d Cir. 1998).

### b.  Summary Judgment

A party will be granted summary judgment when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating that there exists no genuine issue of material fact.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  When considering whether the movant has met its burden, the court must draw all reasonable inferences in favor of the non-moving party.  <u>Matsushita</u>, 475 U.S. at 586.  Summary judgment "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." <u>Hunt v. Cromartie</u>, 526 U.S. 541, 553 (1999).

### 2.  Forfeiture of Deposit

Liani makes four arguments as to why he is entitled to the return of his down payment. First, he argues that he was not a qualified bidder under the terms of the PSA, and thus, because his bid at the public auction was invalid and should never have been accepted, his down payment should be returned.  Second, he argues that even if his bid was valid, Baker's and Sheldon Good's refusal to allow lead-paint testing gave him the right to rescind the contract.  Third, Liani argues that the PSA should be invalidated because material misrepresentations by Sheldon Good concerning the New York Avenue property amounted to fraud in the inducement.  Fourth, he argues that the down payment should be returned because Mr. Baker, in a hand-written letter, disclaimed any interest in it.  These arguments will be addressed in turn.

### a.  Condition Precedent

Paragraph 42 of the PSA includes the following statement: "The seller advises all prospective buyers that they are expected to waive the opportunity to conduct a risk assessment or inspection of the presence of lead-based paint and/or lead-based paint hazards or their bids or offers to purchase will not be considered." PSA ¶ 42. Prior to the auction, Liani signed the PSA, and he concedes that it is a valid contract by which he is bound. Liani's Br. 16 ("Appellant does not dispute the validity of the contract, and in fact . . . specifically asked the Court to uphold the validity of the contract of sale (the PSA).") Liani argues, however, that he did not initial the lead-paint inspection waiver referred to by paragraph 42 of the PSA. The waiver was included in Exhibit D of the PSA. Although Liani did initial the top of Exhibit D, entitled "Disclosure of Information and Acknowledgement" and subtitled "Lead-Based Paint and/or Lead-Based Paint Hazards," he did not initial the specific lead-paint waiver language in the spaces provided. We will assume for purposes of this appeal that this indicates Liani's refusal to agree to the waiver.[1]

Liani argues that the quoted language in paragraph 42 of the PSA operates as a condition precedent and that, because he did not waive the lead paint inspection, his bid could not be considered under the PSA's own terms. The Court agrees with Liani that paragraph 42 creates a condition precedent. This does not, however, invalidate Liani's bid at the public auction. It is hornbook law that a condition precedent intended for the benefit of one party may not be invoked by the other party to invalidate the contract. See 13 Williston on Contracts § 39:24 ("[T]he

---

[1] Liani has characterized his failure to initial the waiver as a refusal of its terms. Baker and Sheldon Good dispute this characterization, arguing instead that Liani's failure to initial the waiver was inadvertent and that Liani should be held to the entirety of the agreement, including the waiver. According to this argument, by signing the PSA and initialing Exhibit D without affirmatively refusing to waive inspection or making an inspection request at that time, in light of ¶ 42 of the PSA, Liani constructively waived his right to inspect. When Liani signed and initialed the PSA, he made no indication that he was objecting to the waiver. Furthermore, Liani's letter demanding the return of his down payment, sent more than a month after the auction, made no mention of the waiver or any concerns about lead-paint. Baker and Sheldon Good argue that these facts undermine any claim that the failure to initial the waiver was intentional. The Court finds that this dispute is ultimately immaterial because even on the version of the facts most favorable to him Liani cannot prevail.

beneficiary of a contract provision, including a condition precedent, has the power to excuse its failure or nonoccurrence, and to compel performance by the other party, so long as the other party has no interest in the occurrence of such condition."); see also Walter E. Heller & Co., Inc. v. Am. Flyers Airline Corp., 459 F.2d 896, 901 (2d Cir. 1972) (citing New York cases for the proposition that "it is hornbook law that a condition precedent in favor of one of the parties may be waived by that party."); cf. A.H.A. Gen. Constr., Inc. v. N.Y. City Hous. Auth., 699 N.E.2d 368 (N.Y. 1998) ("[I]t is a well-settled and salutary rule that a party cannot insist upon a condition precedent, when its non-performance has been caused by himself." (internal quotations omitted)).  A condition precedent may be waived either explicitly or implicitly by conduct.  PB Ams. Inc. v. Cont'l Cas. Co., No. 09 Civ. 1969 (LAP), 2010 WL 532306, at *6 (S.D.N.Y. Feb. 9, 2010); ESPN, Inc. v. Office of Comm'r of Baseball, 76 F. Supp. 2d 383, 389 (S.D.N.Y. 1999).

Normally, the most persuasive evidence to determine for whose benefit a particular contract provision was intended is the actual language of the contract itself.  See W.W.W. Assocs., Inc. v. Giancontieri, 566 N.E.2d 639, 642 (N.Y. 1990); Oak Bee Corp. v. N.E. Blankman & Co., Inc., 551 N.Y.S.2d 559, 561 (N.Y. App. Div. 1990).  In this case, however, Liani concedes in his own brief that the waiver language was placed in the PSA for the benefit of Baker and Sheldon Good.  Liani's Br. 13–14 ("[B]y insisting on the waiver, Appellees Sheldon Good and Aston Baker were attempting to shield themselves from potential liability from lead paint disclosure in the millions of dollars."); id. at 15 ("[T]he broker sought to avoid that liability by only selling to a bidder that would waive the right to inspect and made that waiver a condition precedent to being accepted as a bidder on the property.").

Having accepted Liani's bid at the open auction despite his failure to initial the lead-paint inspection waiver,[2] Baker and Sheldon Good effectively waived this condition precedent. Liani, who did not stand to benefit from the inspection waiver, has no grounds for complaint if his bid was accepted without requiring the waiver.

### b. Inability to Conduct Lead-Paint Inspection

Liani next argues that even if his bid was validly accepted, because he did not execute a lead-paint inspection waiver, he retained his rights to inspect for lead-paint, and the inability to do so justified the rescission of the sale. The first question, then, is what is the source of the asserted right to inspect. Liani argues that his right to inspect has its basis in the Residential Lead-Based Paint Hazard Reduction Act of 1992, 42 U.S.C. § 4851, et seq., specifically, 42 U.S.C. § 4852d and its implementing regulations.

Section 4852d does not by itself directly impose duties on the sellers of property. Sweet v. Sheahan, 235 F.3d 80, 86-87 (2d Cir. 2000) ("[T]he statute imposes obligations on the agencies to promulgate regulations which will then — and only then — impose obligations on sellers and lessors."). Rather, the statute instructs the Environmental Protection Agency to adopt regulations regarding the inspection of property for lead-paint prior to sale. 42 U.S.C. § 4852d. The implementing regulations, codified at 24 C.F.R. § 35 and 40 C.F.R. § 745, do impose certain requirements on sellers of property.

Under 40 C.F.R. § 745.110, a purchaser of residential property must either be provided a period of time in which to inspect the property (which opportunity must be acknowledged by the purchaser in writing, see 40 C.F.R. § 745.113(a)(5)) before being contractually bound, or must

---

[2] Assuming, *arguendo*, that Liani did not constructively agree to the waiver. See supra note 1.

waive in writing the right to inspect.  Furthermore, under 40 C.F.R. § 745.113(a)(2)–(3), a seller

must provide a purchaser with information on any known lead-paint based hazards.  Liani alleges

that Baker and Sheldon Good violated § 745.110 by not providing him with an opportunity to

inspect after he did not sign the waiver.  Further, he alleges that they have violated § 745.113 by

failing to provide him with the results of prior lead-paint tests.

Even assuming that the statute applies to the sale at issue,[3] it provides no remedy for

Liani.  The statute states in very clear language that its violation does not give the purchaser the

ability to void a contract of sale:

> Nothing in this section shall affect the validity or enforceability of any sale or contract for
> the purchase and sale or lease of any interest in residential real property or any loan, loan
> agreement, mortgage, or lien made or arising in connection with a mortgage loan, nor
> shall anything in this section create a defect in title.

42 U.S.C. § 4852d(c).  The case cited by Liani says as much, stating that "[t]he Act does not,

however, give the purchaser or tenant the right to rescind the transaction, contract of sale or lease

if the seller or landlord has failed to comply with the Act's requirements."  Smith, 122 F. Supp.

2d at 268.  Rather, the statute provides that the seller and the seller's agent are liable for treble

damages, costs, and attorney fees for damages resulting from the violation.  42 U.S.C.

§ 4852d(b)(3)–(4).  As Liani conceded in his brief, "[t]he recourse under that statute is liability

for the seller and the broker."  Liani's Br. 15.

In short, even assuming that (1) the statute applies to this bankruptcy sale,[4] (2) Liani did

not implicitly waive his right to inspect,[5] and (3) the property contained lead paint,[6] Liani's only

---

[3] Baker and Sheldon Good argue that sales in bankruptcy are exempt from the requirements of § 4852d.  The
regulations promulgated pursuant to § 4852d include an exception for foreclosure sales, defined in 40 C.F.R.
745.103 as "any of the various methods, statutory or otherwise, known in different jurisdictions, of enforcing
payment of a debt, by the taking and selling of real property."  This appears to be an issue of first impression, but
this argument is not without merit.  A bankruptcy sale, like a traditional foreclosure, involves the taking and selling
of real property for the purpose of satisfying debts.  Because § 4852d provides no remedy to Liani even if it does
apply, the Court need not decide this issue.

statutory remedy against Baker and Sheldon Good would be monetary damages. But Liani, having never even taken possession of the New York Avenue property, cannot have suffered any lead-paint related damages. After forfeiting his interest in the property by defaulting, this statute certainly gives him no grounds to retroactively nullify the sale.

### c. Fraud in the Inducement

Liani next argues that the agreement should be held invalid because of fraud in the inducement on the part of Sheldon Good.[7] He argues that the incorrect number of parking spaces listed in the Bidder's Packet was a material misstatement that amounts to fraud in the inducement. The Bidder's Packet indicated inaccurately, in a section entitled "Property Information," that the New York Avenue property included a total of thirty-two underground and outdoor parking spaces. The Certificate of Occupancy, also included in the Bidder's Packet, correctly stated that the property included a total of twenty-three underground and outdoor parking spaces. Liani argues that as a result of this misrepresentation in the Bidder's Packet, he was fraudulently induced to purchase the property.

Liani cites Europadisk Holdings, LLC. v. Shelton, No. 03 Civ. 4505(NRB), 2004 WL 613109, at *3 (S.D.N.Y. Mar. 26, 2004) (quoting Ceribelli v. Elghanayan, 990 F.2d 62, 64 (2d Cir. 1993)), for the proposition that "[u]nder New York law, 'when one party has superior knowledge not readily available to the other party,' the advantaged party may have a duty to disclose, even in the absence of any fiduciary relationship." But this would apply only if the

---

[4] See supra note 3.

[5] See supra note 1.

[6] Liani has not alleged that the property does in fact contain lead paint, and the record is entirely devoid of any evidence that that is the case. There is, however, deposition testimony to the contrary.

[7] Liani has arguably waived his fraud in the inducement claim. Liani argues in his brief that he "does not dispute the validity of the contract," and that he had "specifically asked the Court to uphold the validity of the contract of sale." Liani's Br. 16. Liani nevertheless turns around mere pages later and argues that the very same contract was invalid. In the interest of completeness, the Court will construe Liani to have been arguing in the alternative.

correct number of parking spaces was "not readily available" to Liani. In Europadisk, for example, the undisclosed information was not discernable from corporate records, there existed only three individuals with knowledge of the information, and the deception extended to an auditor, a licensor, and a senior lender. Id.

In this case, there is no sense in which the correct number of parking spaces was not readily available to Liani. Not only did the very same Bidder's Packet that contained the inaccurate parking space information also include the Certificate of Occupancy indicating the correct number of spaces, but it also included an explicit warning against relying on the information in the packet, directing prospective purchasers to instead conduct their own inspections of the property. The Bidder's Packet also advertised nine separate dates (at least four of which were after the receipt of the Packet by Liani) on which the property would be made available for inspection. Although Liani lived next door to the New York Avenue property, he never conducted an inspection of the property, which would have revealed the correct number of parking spaces. New York courts have consistently held that a party may not complain of fraud in the inducement when he "has the means available to him of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation." Danann Realty Corp. v. Harris, 5 N.Y.2d 317, 322 (N.Y. 1959).

Furthermore, even if the inaccuracies in the Bidder's Packet were deemed to be material misstatements sufficient to amount to fraud in the inducement, Liani has waived any such claim by signing the PSA which included an explicit disclaimer of any reliance on information other than Liani's own examination and investigation. Liani argues, citing Mfrs. Hanover Trust Co. v. Yanakas, 7 F.3d 310, 315 (2d Cir. 1993), that under New York law, a general merger clause cannot preclude a claim for fraud in the inducement. That case, however, surveying New York

case law, expressly distinguishes between a general merger clause, and specific disclaimers of reliance, holding that when "a contracting party disclaims the existence of or reliance upon specified representations, that party will not be allowed to claim that he was defrauded into entering the contract in reliance on those representations."  Id.  Because the PSA contained just such a disclaimer, Liani's fraud in the inducement claim must fail.[8]

### d.  Baker's Letter

Finally, Liani included as an exhibit to his summary judgment motion papers a copy of a handwritten letter that he allegedly received from Baker.  The text of this letter is as follows:

> Dear Mr. Leoni [sic],
>
> Please deliver these documents to your attorney immediately, you should be able to recover your entire deposit of $350,000.00[.][9]  As I did not work for this money I would never enjoy it.  You are a young man, with a lot o[f] potentials [sic].
>
> I am old, and soon will be on my way to heaven.
>
> I remain,
>
> Aston Baker

Letter to Liani, dated Oct. 2, 2007 (capitalization standardized throughout).  According to Liani, this letter amounts to a release by Baker of any interest in the down payment, and thus Liani is entitled to its return.[10]

---

[8] It is not clear whether Liani is also claiming fraud in the inducement based on an earlier version of the PSA which inaccurately stated that the property would be conveyed free of tenants.  If he is, this argument must also fail.  In addition to the reasons given above with relation to the parking spaces, Liani concedes that he received an amended version of the PSA fully five days prior to the auction that accurately stated that the rents and leases of existing tenants would be assigned to the purchaser.  Liani's decision to bid on the property after receiving this information precludes any claim for fraud in the inducement.

[9] As noted above, the actual amount of the deposit was $325,000.

[10] Because Baker was in bankruptcy, Baker's interest in the down payment is part of the bankruptcy estate.  See 11 U.S.C. § 541(a)(6) (defining the bankruptcy estate to include "[p]roceeds, product, offspring, rents, or profits of or from property of the estate").  Thus, one obvious question raised by Liani's argument is whether a release by the debtor can bind the estate.  Because the Court finds that this letter does not constitute a valid release, this question need not be resolved.  It is worth noting, however, that all creditors to Baker's estate have been paid in full.  In such

Baker and Sheldon Good argue that the letter is inadmissible because it was not authenticated as required by Federal Rule of Civil Procedure 56(e)(1),[11] which requires that "[i]f a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit."  A copy of the letter was attached as an exhibit to Liani's affidavit in support of his motion for summary judgment.  Baker and Sheldon Good argue that it is not a "sworn or certified" copy and argue that it is inadmissible, citing Ball v. Metallurgie Hoboken-Overpelt, S.A., No. 87-CV-191, 1989 WL 87418, at *7 (N.D.N.Y. July 31, 1989).[12]  In Ball, as in this case, an affidavit was submitted along with accompanying exhibits.  Id.  Although the exhibits were attached to an affidavit, which is, by definition, a sworn statement, the court found the documents inadmissible because they were "not certified copies" nor did the affidavit explicitly state "that the attached documents are true and accurate copies of the originals."  Id.  This is consistent with the requirement of Rule 56(e)(1) that "a sworn or certified copy must be attached to or served with the affidavit."  If simply attaching a document to an affidavit were sufficient, then the "sworn or certified" language of Rule 56(e)(1) would be superfluous.

---

a case, where the only remaining interest in the property of the estate is the debtor's, there is a strong argument to be made for looking through formal labels.  Cf. Guest v. Hansen, 603 F.3d 15, 21 (2d Cir. 2010) (holding that the administrator of an estate who is also the sole beneficiary may proceed *pro se* as if he were representing his own interests because "[i]t is only a legal fiction that assigns the sole beneficiary's claims to a paper entity — the estate — rather than the beneficiary himself.").  Of course, to the extent that Sheldon Good has an interest in the down payment, see discussion infra, Baker has no power to waive its rights.

[11] Baker and Sheldon Good also argue that the letter is inadmissible hearsay.  This argument is without merit.  The letter is not hearsay under Federal Rule of Evidence 801(c).  Liani does not seek to introduce it for the truth of its assertions, but rather he argues that the letter itself constitutes a release by Baker of his claim to the down payment.  Such legally operative statements are not hearsay under Rule 801.  Fed. R. Evid. 801(c) ("'Hearsay' is a statement . . . offered in evidence to prove the truth of the matter asserted."); Fed. R. Evid. 801, Note to Subdivision (c) ("The effect is to exclude from hearsay the entire category of 'verbal acts' and 'verbal parts of an act,' in which the statement itself affects the legal rights of the parties . . . ."); see also Arasimowicz v. Bestfoods, Inc., 81 F.Supp.2d 526, 530 (S.D.N.Y. 2000) (finding legally operative document non-hearsay under Rule 801(c)).

[12] They also cite Crown Heights Jewish Cmty. Council, Inc. v. Fischer, 63 F. Supp. 2d 231 (E.D.N.Y. 1999), and Wells v. Franzen, 777 F.2d 1258 (7th Cir. 1985), but these cases are inapposite.  In Crown Heights, an affidavit referenced numerous documents which were never submitted to the court.  Crown Heights, 63 F. Supp. 2d at 242–43.  In Wells, it appears that the documents in question were submitted without any accompanying affidavit whatsoever.  Wells, 777 F.2d at 1262 ("These papers were unaccompanied by certifying affidavits or other means of authentication.").

Because the letter was not properly authenticated according to Rule 56(e)(1), the Court may not consider it.

Even if the Court were to consider the letter, however, it would not support Liani's claim to the return of the down payment. The first thing of note is that this letter is incomplete. The letter makes reference to documents that originally accompanied it. But these documents were not submitted to the Court, and the record is devoid of any indication as to their contents. Absent these documents,[13] the letter is, at best, ambiguous. The key language in the letter is the statement that "you should be able to recover your entire deposit." This could, as Liani argues now, be a legally operative waiver of Baker's claim to the money. It could also be interpreted as Baker's assessment of the perceived strength of Liani's legal claim or even as a declaration of the legal outcome that Baker would prefer.[14] It is not clear from this language, however, that Baker believes that he can legally bind his estate, or that he purports to be doing so in this letter. The Court is not prepared to find that Baker has forfeited his contractual right to liquidated damages on the basis of such an incomplete and ambiguous writing. Because Liani has not presented evidence sufficient to show that Baker did indeed waive his rights to the down payment, he has not demonstrated the existence of a genuine issue of material fact which would preclude summary judgment against him.

### 3. Claim to Forfeited Monies

Sheldon Good argues that under the Standard Exclusive Real Estate Auction Agreement (the "Auction Agreement") approved by the bankruptcy court, it is entitled to retain 50% of any

---

[13] And perhaps even with these documents. It is more than a bit striking that although the letter's statement that Liani should be able to recover his deposit appears to be directly related to the referenced documents, Liani has not revealed their content. The Court will not speculate as to what they might have been.

[14] Sheldon Good characterizes Baker as "recalcitrant and litigious throughout this case." Sheldon Good's Reply Br. 14 n.12.

forfeited deposits, capped at the amount of its anticipated commission.[15]  The bankruptcy court

denied Sheldon Good's claim to half the deposit, citing three reasons:  (1) the Auction

Agreement submitted to the court was not signed by either party; (2) the default payment is not

"reasonable compensation for actual, necessary services" under 11 U.S.C. § 330(a)(1); and (3)

the provision in the agreement covering default was not specifically disclosed to or approved by

the court.  The Court will address these issues in turn.

### a.  Lack of Signature

Sheldon Good does not dispute that the Agreement was not signed by the parties,[16] but

rather argues that this lack of signature is irrelevant.  Sheldon Good is not seeking the

enforcement of a contract between two private parties, but rather compliance with a court order

that explicitly incorporated the Agreement by reference.  The bankruptcy court's Order

Authorizing Retention of Exclusive Auctioneer and Approving Terms and Conditions of

Compensation (the "Retention Order") explicitly directed Baker "to retain and employ Sheldon

Good as its Exclusive Auctioneer in accordance with the terms of the Standard Exclusive Real

Estate Auction Agreement (the 'Auction Agreement')."  Retention Order 3.  Because the

Agreement has been incorporated into a court order, it is entirely irrelevant whether it was signed

by the parties.

### b.  Reasonable Compensation under § 330

---

[15] "IF EARNEST MONEY OR SIMILAR DEPOSITS MADE BY A PROSPECTIVE PURCHASER OR TENANT ARE FORFEITED, IN ADDITION TO ANY OTHER RIGHTS OF AUCTIONEER PURSUANT TO THIS AGREEMENT, AUCTIONEER AND SELLER SHALL DIVIDE THE MONIES EQUALLY PROVIDED, HOWEVER, AUCTIONEER'S PORTION SHALL NOT EXCEED THE TOTAL AMOUNT OF ANTICIPATED COMMISSION."  Auction Agreement § VII.E.

[16] Sheldon Good does note, however, that the Agreement was submitted to the bankruptcy court by Baker.

The employment of professionals, including auctioneers, by a bankruptcy estate is permitted under 11 U.S.C. § 327, which provides:

> Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a). The compensation of a professional employed under § 327 is determined according to either § 328 or § 330.

Under § 328, the court may approve the terms and conditions of a professional's employment, including compensation:

> The trustee, or a committee appointed under section 1102 of this title, with the court's approval, may employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, on a fixed or percentage fee basis, or on a contingent fee basis. Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

11 U.S.C. § 328(a). Under this provision, the form of compensation is established by the court at the time employment is approved.

On the other hand, § 330 authorizes the court to award after the fact reasonable compensation for services rendered:

> (1) After notice to the parties in interest and the United States Trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, a consumer privacy ombudsman appointed under section 332, an examiner, an ombudsman appointed under section 333, or a professional person employed under section 327 or 1103 —
>
> > (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, ombudsman, professional person, or attorney and by any paraprofessional person employed by any such person; and

(B) reimbursement for actual, necessary expenses.

. . . .

(3) In determining the amount of reasonable compensation to be awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including--

(A) the time spent on such services;

(B) the rates charged for such services;

. . . .

11 U.S.C. § 330(a)(1),(3)(A)–(B).

The parties dispute which provision of the Bankruptcy Code, § 328 or § 330, governs the Court's review of Sheldon Good's compensation. According to Baker and the decision of the Bankruptcy Court, § 330 establishes the applicable standard, providing that "the court may award to . . . a professional person employed under section 327 . . . reasonable compensation for actual, necessary services rendered." 11 U.S.C. § 330(a)(1). Under this reading, the Court's denial of Sheldon Good's request for 50% of the forfeited down payment may be justified simply by the Court's determination that this money does not represent compensation for actual, necessary services rendered.

Sheldon Good, on the other hand, argues that the Bankruptcy Court is bound by § 328, which allows the Court to approve "any reasonable terms and conditions of employment," subject to the Court's authority to alter these terms after the fact "if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." 11 U.S.C. § 328(a). Sheldon Good argues that, under this standard, it would prevail because the terms at issue were not improvident and the subsequent development — namely Liani's default — was not incapable of being anticipated.

16

Although § 330 gives the court the power to award compensation for services performed for the estate after the fact based on a lodestar formula, <u>see</u> 11 U.S.C. § 330(a)(3), under § 328, the estate may establish a different method of compensation for professionals, provided that the terms are approved by the court beforehand.  When such terms have been approved by the court, then § 328, not § 330, governs.  <u>See</u> 11 U.S.C. § 330(a)(3) (award of reasonable compensation is "subject to section[] . . . 328"); <u>see also</u> <u>In re Smart World Techs., LLC</u>, 552 F.3d 228, 234 (2d Cir. 2009) ("Under section 328(a), a pre-approved fee arrangement may only be altered if proven to have been improvident in light of developments not capable of being anticipated at the time of the pre-approval." (internal quotations omitted)); <u>see also</u> <u>Matter of Nat'l Gypsum Co.</u>, 123 F.3d 861, 862 (5th Cir. 1997) ("If prior approval is given to a certain compensation, § 328 controls and the court starts with that approved compensation, modifying it only for developments unforeseen when originally approved.").

Baker argues that the Retention Order was not a pre-approval under § 328.  In <u>Smart World</u> the Second Circuit established that the "pre-approval of a fee agreement under 11 U.S.C. § 328(a) depends on the totality of the circumstances, including whether the professional's application, or the court's order, referenced section 328(a), and whether the court evaluated the propriety of the fee arrangement before granting final, and not merely preliminary, approval." <u>Smart World</u>, 552 F.3d at 233.[17]  Here, the Court has no doubt that the Retention Order qualifies as a pre-approval under § 328.  The bankruptcy court "retain[ed] and reserve[d] jurisdiction to determine . . . in accordance with 11 U.S.C. §§ 327 through 331 . . . payments of

---

[17] Baker's brief argues that the Court should apply the more restrictive standard of <u>In re Circle K Corp.</u>, 279 F.3d 669 (9th Cir. 2002) and <u>Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.</u>, 50 F.3d 253 (3d Cir. 1995).  The Court is bothered by the fact that counsel quoted these out-of-circuit opinions for the applicable legal standard without alerting the Court that the holdings of these cases had been explicitly and unequivocally rejected by the Second Circuit in <u>Smart World</u>.  552 F.3d at 233.  Counsel is reminded of his duty of candor to this Court.  <u>See</u> N.Y. Rules of Professional Conduct, Rule 3.3(a)(2).

x

Although § 330 gives the court the power to award compensation for services performed for the estate after the fact based on a lodestar formula, <u>see</u> 11 U.S.C. § 330(a)(3), under § 328, the estate may establish a different method of compensation for professionals, provided that the terms are approved by the court beforehand.  When such terms have been approved by the court, then § 328, not § 330, governs.  <u>See</u> 11 U.S.C. § 330(a)(3) (award of reasonable compensation is "subject to section[] . . . 328"); <u>see also</u> <u>In re Smart World Techs., LLC</u>, 552 F.3d 228, 234 (2d Cir. 2009) ("Under section 328(a), a pre-approved fee arrangement may only be altered if proven to have been improvident in light of developments not capable of being anticipated at the time of the pre-approval." (internal quotations omitted)); <u>see also</u> <u>Matter of Nat'l Gypsum Co.</u>, 123 F.3d 861, 862 (5th Cir. 1997) ("If prior approval is given to a certain compensation, § 328 controls and the court starts with that approved compensation, modifying it only for developments unforeseen when originally approved.").

Baker argues that the Retention Order was not a pre-approval under § 328.  In <u>Smart World</u> the Second Circuit established that the "pre-approval of a fee agreement under 11 U.S.C. § 328(a) depends on the totality of the circumstances, including whether the professional's application, or the court's order, referenced section 328(a), and whether the court evaluated the propriety of the fee arrangement before granting final, and not merely preliminary, approval." <u>Smart World</u>, 552 F.3d at 233.[17]  Here, the Court has no doubt that the Retention Order qualifies as a pre-approval under § 328.  The bankruptcy court "retain[ed] and reserve[d] jurisdiction to determine . . . in accordance with 11 U.S.C. §§ 327 through 331 . . . payments of

---

[17] Baker's brief argues that the Court should apply the more restrictive standard of <u>In re Circle K Corp.</u>, 279 F.3d 669 (9th Cir. 2002) and <u>Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.</u>, 50 F.3d 253 (3d Cir. 1995).  The Court is bothered by the fact that counsel quoted these out-of-circuit opinions for the applicable legal standard without alerting the Court that the holdings of these cases had been explicitly and unequivocally rejected by the Second Circuit in <u>Smart World</u>.  552 F.3d at 233.  Counsel is reminded of his duty of candor to this Court.  <u>See</u> N.Y. Rules of Professional Conduct, Rule 3.3(a)(2).

Although § 330 gives the court the power to award compensation for services performed for the estate after the fact based on a lodestar formula, <u>see</u> 11 U.S.C. § 330(a)(3), under § 328, the estate may establish a different method of compensation for professionals, provided that the terms are approved by the court beforehand.  When such terms have been approved by the court, then § 328, not § 330, governs.  <u>See</u> 11 U.S.C. § 330(a)(3) (award of reasonable compensation is "subject to section[] . . . 328"); <u>see also</u> <u>In re Smart World Techs., LLC</u>, 552 F.3d 228, 234 (2d Cir. 2009) ("Under section 328(a), a pre-approved fee arrangement may only be altered if proven to have been improvident in light of developments not capable of being anticipated at the time of the pre-approval." (internal quotations omitted)); <u>see also</u> <u>Matter of Nat'l Gypsum Co.</u>, 123 F.3d 861, 862 (5th Cir. 1997) ("If prior approval is given to a certain compensation, § 328 controls and the court starts with that approved compensation, modifying it only for developments unforeseen when originally approved.").

Baker argues that the Retention Order was not a pre-approval under § 328.  In <u>Smart World</u> the Second Circuit established that the "pre-approval of a fee agreement under 11 U.S.C. § 328(a) depends on the totality of the circumstances, including whether the professional's application, or the court's order, referenced section 328(a), and whether the court evaluated the propriety of the fee arrangement before granting final, and not merely preliminary, approval." <u>Smart World</u>, 552 F.3d at 233.[17]  Here, the Court has no doubt that the Retention Order qualifies as a pre-approval under § 328.  The bankruptcy court "retain[ed] and reserve[d] jurisdiction to determine . . . in accordance with 11 U.S.C. §§ 327 through 331 . . . payments of

---

[17] Baker's brief argues that the Court should apply the more restrictive standard of <u>In re Circle K Corp.</u>, 279 F.3d 669 (9th Cir. 2002) and <u>Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.</u>, 50 F.3d 253 (3d Cir. 1995).  The Court is bothered by the fact that counsel quoted these out-of-circuit opinions for the applicable legal standard without alerting the Court that the holdings of these cases had been explicitly and unequivocally rejected by the Second Circuit in <u>Smart World</u>.  552 F.3d at 233.  Counsel is reminded of his duty of candor to this Court.  <u>See</u> N.Y. Rules of Professional Conduct, Rule 3.3(a)(2).

compensation . . . to Sheldon Good . . . notwithstanding the terms and conditions of compensation set forth in the Application and the Auction Agreement." Id. at 4. This language is fully consistent with the parallel language of § 328 which authorizes the provision of different compensation "[n]otwithstanding such terms and conditions [approved by the court]."

Crucially, the Retention Order declares that Sheldon Good shall receive as compensation a 7% commission on auction sales. Retention Order 3. Sheldon Good in fact received this 7% commission upon the sale of the other properties at auction, and neither Baker nor the bankruptcy court contest Sheldon Good's entitlement to those payments. Section 330, however, unlike § 328, does not authorize the payment of commissions, but rather requires reasonable compensation based on a lodestar calculation. The only source of authority for the court's approval of commission payments is § 328, which allows for "any reasonable terms and conditions," including employment on a "percentage fee basis." 11 U.S.C. §§ 328(a). For this reason, the Court interprets the Retention Order as pre-approval under § 328.

### c.  Scope of Pre-Approval

Although the retention of Sheldon Good was authorized under § 328, there remains the question of whether the forfeiture provision falls within the scope of the § 328 pre-approval. Baker argues, and the bankruptcy court held, that because the forfeiture provision was not explicitly called to the court's attention when seeking approval for Sheldon Good's retention, nor cited by the court in the Retention Order, it has not been approved. This argument is at odds with the language of the Retention Order itself which directed Sheldon Good's employment "in accordance with the terms of the Standard Exclusive Real Estate Auction Agreement (the 'Auction Agreement')." Retention Order 3. The Court did not limit its approval to certain key

18

terms, but rather ordered that "the terms and conditions of the Auction Agreement are hereby approved, including, but not limited to," the 7% commission. Id. Although the Rule 2014 Affidavit signed by a representative of Sheldon Good, which was included in the Application submitted to the bankruptcy court, highlighted only the most salient terms, the entire agreement was appended to the submission, and was before the court.[18]

As a practical matter, agreements concerning commercial transactions routinely contain numerous provisions intended to address various potential contingencies. The effect of the nullification of those portions of the agreement that were not specifically called to the judge's attention would be to create perverse incentives for future parties. They might refrain from highlighting or drawing the judge's attention to any key provisions, for fear that this focus might render any unemphasized portions of the agreement unenforceable. Or they might retreat to the most minimal agreements, leaving it to the courts to sort out any and all unaccounted for contingencies *ex post*.[19] Neither of these options is appealing.[20]

Baker further argues that the bankruptcy court should not be deemed to have approved the forfeiture provision because that provision conflicts with Local Bankruptcy Rule 6005-1. Rule 6005-1 provides for compensation for auctioneers in the form of commissions and

---

[18] The affidavit described "the terms of Sheldon Good's compensation for the above services, *in pertinent part*" and indicated with ellipses that some information had been omitted. Rule 2014 Affidavit ¶ 6. It did not purport to fully recount the entire Auction Agreement. It is worth noting that the forfeiture provision was one of only two provisions in the entire six-page Auction Agreement that was typeset entirely in capital letters, thus inviting greater attention than the other provisions of the agreement.

[19] It seems plausible that, in the absence of an explicit forfeiture provision, an auctioneer in Sheldon Good's position who petitioned the Court for reasonable compensation for services under § 330 might well be successful. It would be ironic then that here, where the agreement explicitly provided for compensation, the auctioneer would end up with nothing.

[20] In an earlier order by the bankruptcy court, In re Baker, 374 B.R. 489 (Bankr. E.D.N.Y. 2007), the court relied explicitly on an indemnification provision in the Auction Agreement. This provision was not explicitly called to the court's attention, nor referenced in the Retention Order, and thus the bankruptcy court implicitly rejected the argument Baker makes here. This Court's discussion of the indemnification provision, infra, addresses the law-of-the-case issue raised by Sheldon Good.

reimbursement of expenses (subject to certain limitations), but makes no provision for other forms of compensation. Although the language of Rule 6005-1 does not explicitly prohibit compensation other than commissions and reimbursement of expenses, under a fair reading of the rule other forms of compensation are likely precluded by negative implication. The bankruptcy court, however, has substantial discretion to depart from the local rules. See Local Bankruptcy Rule 1001-1(c) ("In the interest of justice or for cause, the Court may modify or suspend the requirements set forth in these rules."). Rule 6005-1 makes no provision for contingencies such as a winning bidder's subsequent default. It would certainly not be an abuse of discretion to approve an agreement anticipating situations beyond those Rule 6005-1 was designed to address. The bankruptcy court already proved itself willing to depart from the local rules in explicitly approving a commission above the rate called for in the rules.[21]

The bottom line is that the Auction Agreement was submitted to the bankruptcy court in its entirety, and the court approved it without modification.

### d. Unanticipated Developments

Having concluded that the forfeiture provision was approved by the bankruptcy court under § 328, the Court must now consider whether the bankruptcy court might nonetheless disregard it because it has "prove[d] to have been improvident in light of developments not

---

[21] To the extent that Baker can be read as also attacking the 7% commission itself, this argument is rejected. The 7% commission approved by the bankruptcy court appears to squarely conflict with Rule 6005-1, which places caps on the acceptable commission, including a limit of "2% of any gross proceeds of sale in excess of $150,000." As already noted, however, the bankruptcy court does have considerable discretion to depart from the local rules under Local Bankruptcy Rule 1001-1(c). Although the bankruptcy court apparently did not give any explanation of its departure from Rule 6005-1, this decision is within the sound discretion of the bankruptcy court, and this Court will certainly not disturb it when it has not been squarely challenged by any of the parties.

On the other hand, there is no merit in Sheldon Good's argument that the 7% commission is acceptable under 6005-1 because it came out of the 7.5% Buyer's Premium over and above the high bid price. As a formal matter, 6005-1 makes no reference to the source of the funds that cover the commission. And, as a functional matter, elementary economics suggests that auction participants will take the Buyer's Premium into account when bidding and will accordingly decrease their maximum bids to compensate.

capable of being anticipated at the time" it was approved. 11 U.S.C. § 328(a). Courts have

consistently held that § 328 "is a high hurdle to clear" and can be overcome only by

developments that "were *incapable* of being anticipated (as opposed to merely not actually

anticipated)." Smart World, 552 F.3d at 235 (emphasis in original). It was certainly not

unreasonable for an auctioneer to seek to protect itself from the effects of a default that was

beyond its control. And a fifty-fifty split of the forfeited deposit is not unreasonable *ex ante*,

when there is no way of knowing how much the property might sell for on resale or how much

additional work might be required by the auctioneer to resell it. Most importantly, however, it is

impossible to argue that Liani's default was a development "not capable of being anticipated."

The very provision at issue was included in the agreement precisely because the possibility of

default *was* anticipated.

Furthermore, the Court finds the characterization of the receipt of a portion of the

forfeited deposit as a "windfall" to be without basis. Sheldon Good conducted a public auction

at which bids were taken on four properties. Had Liani not defaulted, Sheldon Good would have

been entitled under the Auction Agreement to receive a commission on each of the four sales. If

a winning bidder were subsequently to default, Sheldon Good would be deprived of the

commission for which it had worked. Had the sale to Liani gone through, Sheldon Good would

have been entitled to a commission of $350,000. Sheldon Good lost this commission through no

fault of its own[22] when Liani chose to default.

---

[22] Baker's allegation that Sheldon Good was negligent in not taking a deposit from a backup bidder at the auction is entirely baseless. The Auction Agreement contains no provision for taking a deposit from a backup bidder, and in fact states that "[b]ecause of the pace of the open-outcry Auction bidding, Auctioneer is not able and therefore not obligated to recognize nor record each of the bidders at any bid level during outcry except the high bidder." Auction Agreement § VII.J.

Baker has made much of the damages he suffered due to Liani's default and the fact that the forfeiture of the down payment was explicitly justified in the PSA as liquidated damages. But Sheldon Good also suffered damages in that it lost the commission on a sale at auction that it worked to promote. Baker points out, correctly, that Sheldon Good eventually earned a commission on the sale of the New York Avenue property, but fails to note the additional work that Sheldon Good performed subsequent to Liani's default — work that Sheldon Good would not have performed absent the default — in order to conduct a second sale of the property.[23]

Sheldon Good is thus entitled under the Auction Agreement to 50% of the forfeited down payment, *i.e.* $162,500.

## 4. Indemnity for Legal Costs

Sheldon Good also seeks indemnification from Baker for its legal costs pursuant to another provision of the Auction Agreement. See Auction Agreement § VI.B. Sheldon Good argues that because the bankruptcy court already ordered indemnification under this provision in an earlier opinion, see In re Baker, 374 B.R. 489, 493 (Bankr. E.D.N.Y. 2007), the law-of-the-case doctrine should dictate the result here.

Law of the case is a doctrine of judicial efficiency that allows a court to avoid time-consuming relitigation of issues already decided. It is not a substantive limit on the power of the court, however, and every court retains the authority to reconsider its prior non-final rulings. United States v. Uccio, 940 F.2d 753, 758 (2d Cir. 1991) ("[T]his branch of the [law-of-the-case] doctrine, while it informs the court's discretion, does not limit the tribunal's power." (internal

---

[23] Baker also refers, misleadingly, to the more than $800,000 in commissions already earned by Sheldon Good, without explaining that this number includes the commissions earned on the other three properties that sold at the initial auction.

quotations omitted)).  Sheldon Good was certainly entitled to argue to the bankruptcy court that, based on law-of-the-case principles, it should not reconsider the issue.  But the bankruptcy court was not bound by its previous decision and had the authority to reach a different result.[24]

Furthermore, the law-of-the-case argument is misplaced before this Court on appeal.  An appellate court is not bound by an earlier ruling of the lower court, even if that ruling would have been law of the case for the lower court.  Cf. Mercer v. Theriot, 377 U.S. 152, 153 (1964) (recognizing that Supreme Court is not bound by earlier Court of Appeals decisions in the same case).  Rather, this Court will consider the issues raised on appeal on the merits.

First, Baker argues, and the bankruptcy court held, that Sheldon Good was required under 11 U.S.C. § 327 to seek court approval before hiring the law firm Arent Fox to represent it in this adversary action.  But § 327 applies only to professionals hired to represent or assist the estate. Sheldon Good hired Arent Fox to represent its own interests, and no provision of the bankruptcy

---

[24] It is certainly interesting, however, to read the two opinions together.  They were issued by the same judge in the same case, addressing the exact same issue, but arrive at opposite conclusions with no explanation of the change. The relevant portions of the two opinions follow.

> The Court further finds that Sheldon Good was not required to retain Arent Fox as a professional pursuant to Section 327 of the Bankruptcy Code.  Arent Fox was not a representative of the estate.  Sheldon Good hired Arent Fox to defend and respond to the appeals that the debtor filed.  On June 20, 2005, this Court issued the Auctioneer Order which approved Sheldon Good as the Auctioneer of the Properties and approved the terms and conditions of the Auction Agreement.  As previously noted, the Auction Agreement specifically provided that the debtor would indemnify Sheldon Good for all "liabilities, losses, damages, claims, suits, causes of action third party actions . . . including actual legal fees and costs."  Thus, the Court's Order obligated the debtor to reimburse Sheldon Good for legal fees and expenses incurred in connection with the court approved auction of the Properties.

In re Baker, 374 B.R. 489, 493 (Bankr. E.D.N.Y. 2007).

> Sheldon Good also seeks indemnification from the debtor for legal fees of the law firm of Arent Fox in representing Sheldon Good in this adversary proceeding pursuant to the Auctioneer Agreement.  The Court denies this application for several reasons.  The Bankruptcy Code requires court approval of the employment of the law firm of Arent Fox as counsel for Sheldon Good at the estate's expense.  Sheldon Good has not sought such an Order.  Such approval would have been unlikely, given the law firm's prior representation of one of the debtor's largest creditors, Gallster Capital.  In addition, as counsel for the debtor noted, indemnity provisions are looked upon with disfavor in bankruptcy proceedings.

Liani v. Baker, No. 05-1556-dem, 2009 WL 1312922, at *11 (Bankr. E.D.N.Y. May 4, 2009).

code requires court approval for the indirect employment of professionals by third parties.[25]  The question here is only whether, having employed professionals and thereby incurred costs, Sheldon Good is entitled under the Auction Agreement to indemnification for those costs.

Second, Baker argues that he is not bound by the indemnification provision of the Auction Agreement because it was not expressly approved by the bankruptcy court.  This argument is rejected for reasons already discussed, <u>supra</u>, in relation to the forfeiture provision.

Third, Baker argues, and the bankruptcy court held, that the indemnification provision should not be enforced because such provisions are disfavored in bankruptcy proceedings.  As an initial matter, the indemnification provision is part of the terms and conditions of employment approved by the bankruptcy court under § 328.  <u>See</u> discussion <u>supra</u>.  As discussed above, such terms can be disregarded only if they "prove to have been improvident in light of developments not capable of being anticipated at the time."  11 U.S.C. § 328(a).  It is impossible for Baker to make this showing; the indemnity provision specifically anticipated "interpleader actions or other lawsuits involving earnest money or other sums held by Auctioneer for the benefit of Seller and/or Purchaser in connection with the Property."  Auction Agreement § VI.B(b).[26]

Finally, Baker argues that only Liani can be liable to Sheldon Good because a provision in the PSA requires that in the event of a dispute over the money in escrow, "expenses shall be paid by the party whose position shall not be sustained."  PSA § 5(C).  But the PSA only governs the relationship between the Seller and the Purchaser, *i.e.* Baker and Liani.  The relationship between Baker and Sheldon Good is defined by the court-approved Auction Agreement.

---

[25] Because no court approval was required, the bankruptcy court's suggestion that it would not have approved the retention of Arent Fox due to a potential conflict of interest is irrelevant.

[26] The Court need not reach the question of whether indemnity provisions are *disfavored* in bankruptcy proceedings. Neither Baker nor the bankruptcy court has suggested that they are *forbidden*.

Sheldon Good is thus entitled to indemnification from Baker for its legal expenses.

## CONCLUSION

For the aforementioned reasons, the judgment of the Bankruptcy Court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings.

SO ORDERED.

Dated:      Brooklyn, New York
           June 28, 2010

_____/s/_____
I. Leo Glasser
United States Senior District Judge

**Copies of the foregoing memorandum and order were electronically sent to:**

**<u>Counsel for Appellant-Appellee Simon Liani</u>**

Avrum J. Rosen
Law Offices of Avrum J. Rosen
38 New Street
Huntington, NY 11743

**<u>Counsel for Appellee-Appellant Sheldon Good & Company Auctions North East, LLC</u>**

Heidi Jan Sorvino
Arent Fox PLLC
1675 Broadway
New York, NY 10019

**<u>Counsel for Appellee Aston Baker</u>**

Roy J. Lester
Lester & Weitz, P.C.
600 Old Country Road
Suite 229
Garden City, NY 11530